IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| EDEN GHEBREAB, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 1:16-cv-1088 (LMB/JFA) |
| INOVA HEALTH SYSTEM, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Eden Ghebreab ("plaintiff" or "Ghebreab"), proceeding pro se, has filed a two-count complaint alleging discrimination in compensation and retaliatory discharge under Title VII of the Civil Rights Act of 1964 on the basis of race and national origin against defendant Inova Health System ("defendant" or "Inova") and seeking $1,000,000.00 in damages. Before the Court is defendant's Motion for Summary Judgment, which argues that the Court lacks subject-matter jurisdiction over the discrimination claim because it was not timely exhausted and that plaintiff's retaliatory discharge claim fails because she has not demonstrated that she engaged in a protected activity. For the reasons that follow, defendant's Motion for Summary Judgment will be granted.

## I. BACKGROUND

Ghebreab is a black female from Eritrea. Pl. Facts, [Dkt. 39] at ¶ 4. Inova, a large hospital in Northern Virginia, hired her in 2002 as a registrar in its Office of Continuing Medical Education ("CME Department"), an office which "provides services such as accrediting meetings, developing programs, applying for grants or securing other funding for meetings, and managing speakers for meetings." Def. Ex. 1, [Dkt. 33-1] at ¶ 6; Def. SUMF, [Dkt. 33] at ¶ 5.

In 2004, Dr. Madeline Erario ("Erario") was made director of the CME Department. At around the same time, plaintiff's title was changed from "registrar" to "data specialist." Def. SUMF, [Dkt. 33] at ¶ 4; Pl. Facts, [Dkt. 39] at ¶ 6.

Although plaintiff received generally positive performance reviews, she demonstrated an unwillingness to accept constructive criticism. For example, in 2006, plaintiff received an overall score of 424.25 out of 500 possible points, which is designated "commendable" on Inova's scale for performance reviews.[1] Def. Ex. 7, [Dkt. 33-7] at 10. Her scores were distributed relatively evenly among the "exceeds all standards," "often exceeds standards," and "meets standards" categories. Id. at 4–8. Despite the overall positive nature of this review, Ghebreab refused to sign the review, id. at 1, and attached a self-assessment stating, "The assessment I was give[n] . . . does not reflect my exceeding all standards of some of my work and often exceeding on others. There for [sic] I have asked for a review by director [sic] before I sign my assessment," id. at 13.

In 2008, plaintiff was promoted to a Senior Meeting Planner and Credentialing Specialist, which included a substantial portfolio of event planning. Def. SUMF, [Dkt. 33] at ¶ 8. The promotion included a pay raise, and in her new position plaintiff was designated as an "exempt" worker under the Fair Labor Standards Act ("FLSA"), meaning she was not entitled to overtime pay under the FLSA. Id.

As the CME Department expanded its portfolio, Inova decided to bring additional people into the department. In January 2009, Inova hired Kelley Sanchez ("Sanchez") as the CME Department manager. Id. at ¶ 9. According to plaintiff, Sanchez received the job in part because

---

[1] Inova uses a six tier scale for performance reviews: "Distinguished (450–500 points), Commendable (400–449 points), Competent (300–399 points), New Employee (200–299 points), Provisional (200–299 points), Unsatisfactory (100–199 points)." Def. Ex. 6, [Dkt. 33-6] at 9.

2

she was friends with the CME Department's director. Pl. Facts, [Dkt. 39] ¶ 9. After Catherine Tumelty ("Tumelty") joined the department in August 2009, Sanchez supervised at least three Senior Meeting Planners in total, including Ghebreab, Tumelty, and Kellen Bagnoli ("Bagnoli").[2] Def. SUMF, [Dkt. 33] at ¶ 10.

Plaintiff alleges in an unsigned, undated statement attached to her opposition that Sanchez made two racially-tinged comments in 2009. First, she alleges that on February 5, 2009, "Sanchez said she could not believe how many Africans work[ed] for the hospital giv[en] the location." Pl. Ex. 1c1, [Dkt. 39-2] at 32. When Ghebreab asked what she meant by that, Sanchez allegedly "said the area is considered a 'white neighborhood.'" Id. Sanchez allegedly made the second comment on September 8, 2009, when Ghebreab and Sanchez were working on a CME event that served lunch. Id. According to Ghebreab, Sanchez said, "[T]hese African nurses don't mind standing for a long time on line to get their lunch. To be honest, I think they just come for the lunch, not to learn anything." Id. Defendant denies that Sanchez made these comments.

CME Department members occasionally travel for educational programming. In 2009, several department members took such a trip to Chicago, with Ghebreab and Tumelty traveling in August and Sanchez and Bagnoli traveling in December. Def. SUMF, [Dkt. 33] at ¶ 11. Because such trips require the Senior Meeting Planners to work long hours on weekends, the department permits them to take compensatory time off ("comp time") in lieu of overtime pay. Inova had a policy governing comp time, which stated that "the CME manager/director" would "approve and provide comp time to CME staff," and that "the staff will be responsible to keep their hours in a shared drive excel account." Pl. Ex. 1b5, [Dkt. 39-2] at 9. At some point after

---

[2] Plaintiff and defendant do not agree about how many other Senior Meeting Planners were employed by Inova, but this dispute is irrelevant.

3

the Chicago trip, the practice of keeping such records on a shared drive was abandoned, and employees were responsible for keeping their own records and periodically sharing them with Sanchez, Erario, and Human Resources personnel. See Pl. Facts, [Dkt. 39] at ¶ 13.

Ghebreab claims that Sanchez specifically told her that she was not permitted to take comp time for the Chicago trip, although Sanchez has no memory of any such conversation. Compare Pl. Facts, [Dkt. 39] at ¶ 14, with Def. SUMF, [Dkt. 33] at ¶ 19. Sanchez does remember speaking to Tumelty, who was new to the department, about the comp time policy shortly before the Chicago trip, and does not remember if Bagnoli was present for that conversation. Def. SUMF, [Dkt. 33] at ¶¶ 13–14. Both Bagnoli and Tumelty received comp time for the Chicago trip. Id. Plaintiff claims that she did not know at the time that the other two Senior Meeting Planners received comp time for the Chicago trip. Pl. Facts, [Dkt. 39] at ¶ 15. She asserts, without pointing to any evidentiary support for the claim, that Sanchez changed the policy about keeping comp time on the shared drive with the purpose of keeping this disparate treatment hidden from Ghebreab. Id. at ¶ 13.

In August 2010, plaintiff took a trip to Eritrea. She alleges in the same undated, unsigned document discussed above that on her first day back, August 16, 2010, Sanchez said "I bet you are so glad to be back to civilization. . . . I don't know how you do it, I would never put myself through that. You look like you [are] going to need recover[y] time." Pl. Ex. 1c1, [Dkt. 39-2] at 32. Plaintiff took this comment to be racially motivated. See id.

In November 2010, while Sanchez was on maternity leave, plaintiff took a trip to Richmond with Tumelty and Bagnoli. Pl. Facts, [Dkt. 39] at ¶ 15. While they were on the train, plaintiff claims that Tumelty and Bagnoli said they were looking forward to receiving comp time for the trip. Id. Plaintiff claims that she expressed surprise, thinking that the trip could not add

4

to their comp time because she was told that the Chicago trip did not count. Id. Tumelty and Bagnoli then informed plaintiff that they were both given comp time for the Chicago 2009 trip. Id.

Because Sanchez was out on maternity leave when plaintiff learned about Tumelty and Bagnoli receiving comp time, she complained directly to Erario. According to plaintiff, she "clearly informed Ms. Erario of my discrimination and past miss treatments [sic] by Ms. Sanchez." Id. at ¶ 16.[3] When Erario asked her why Sanchez might be discriminating against her, plaintiff alleges that she replied, "I don't know, I work very hard on all my work always and do great job [sic] per your feedback. The only thing is I am different form [sic] them and it hurts to feel this way and I can't change who I am even if I want to." Id. Beyond the vague reference to being "different" from Bagnoli and Tumelty, plaintiff did not mention her race or national origin explicitly in her account of that conversation. See id.

On November 29, 2010, Sanchez returned from maternity leave, and Ghebreab presented her with a written complaint airing a number of grievances, including the Chicago comp time disparity. Def. Ex. 5, [Dkt. 33-5]. The complaint began with a brief introduction, which stated, "For the last two years of your time her[e] at CME I kept doubting my self [sic] saying maybe I am paying attention to the things that are bothersome and disappointing to me. However after reviewing my two years evaluation and thinking about all the things listed below I was correct in my feelings that as Inova's 9+ years's [sic] employee I have being [sic] treated unfairly." Id. at 1. Ghebreab then listed 13 numbered complaints, covering a wide range of issues from financial recordkeeping, to the comfort of the chairs provided to employees. Not a single issue

---

[3] This account is taken from plaintiff's memorandum opposing summary judgment. Neither party has submitted any deposition testimony or interrogatories.

5

referenced plaintiff's race, national origin, or the discriminatory comments she alleges Sanchez made. Id. at 1–5. The paragraph on the comp time issue reads as follows:[4]

> You informed all three of us to remove the comp time from the share drive so that Maureena [a Human Resources employee] doesn't have access to see it so we moved it. At this point no one is over seeing the comp time and I have been learning there is more to it than Maureena seen it. Early in 2010 you called me to your office and said our director has a problem with my comp time and I said okay lets got meet with her, we went and I could not see where she has a problem everything was fine as my work ethic is to be trustful and not to cheat inova of any time so I had no worries. The ironic about this is that after all four of us when to Chicago for ACCME you informed my collogues to add 16 hours of comp time for the trip and no one knows what you added for your self. However you never informed me to add 16 hours for my time, I was the only one who did not get the comp time for the time that I took from my kids. Why wasn't one e-mail out to all the staff? Even if you request to see every one's comp time more than one time, clearly mine was not there . . . I am just finding out about this. Had the comp time was stored where every one could see in shared drive as it had being all a long I would of asked about this then. Individuals frequently leave at half day to doctor's appointments and never have to make it up. In my case the times I had doctors appointment I always would make it up and you never said as exempt employee I don't have to make it up, why? I worked in this deparment for 9+ years and I have never seen people earning as much time off as I am seeing in such a short time or I am not aware of a new inova's police that explains it. Anyways I will leave this for due time and I will be focusing on my miss treatment.

Id. at ¶ 4. Ghebreab concluded the complaint by writing:

> I am not so naïve to think this issue/mistreatment will be gone by me addressing it however I need to make sure my rights as Inova employee is understood. I also know this hostility is harmful to my health however I couldn't just leave the CME department after investing almost ten years of my time and not having done any thing wrong except looking out for nova's best interest. I also might add I suffered foot injury in this department and it has being ongoing treatment and suffering. Therefore the needs for it that Dr. Erario allows me to walk and get movement on my foot is some thing in my best interest. With all that has being said at the end of the day Inova is responsible. The only thing I can do is to make sure to represent my self and proof all miss treatment, unfairness, and misrepresentation, by you. This situation is clearly power abuse and unfair use of power.
>     I have not shared this with Dr. Erario, Dr. Senica or HR, except the Chicago comp time I shared it with Dr. Erario. I am just sharing it with you at

---

[4] All grammatical and spelling errors appear in the original.

>           this time so that you could see my frustration and be informed of my
>           disappointment. I never bother any one but I have being encountering all of these
>           issues and my honesty is questioned while it is the other way around, I am not so
>           sure why.

Id. at 5.

Also in November 2010, shortly before Sanchez returned from maternity leave, Erario met with plaintiff to present her annual performance review, which had been completed by Sanchez. Def. Ex. 6, [Dkt. 33-6] at 1. Plaintiff received a score of 400, which is a "commendable" rating. Id. at 9. Once again, plaintiff refused to sign the review. Id. at 1. On December 1, 2010, she attached a statement to the performance review taking issue with various comments in it, none of which related to the Chicago comp time issue, her race, or national origin. Id. at 11.

According to defendant, shortly after Sanchez returned from maternity leave Tumelty and Bangnoli began to complain about Ghebreab's conduct in the workplace, saying that she had been "bullying and intimidating them." Def. Ex. 4, [Dkt. 33-4] at ¶ 15.

In late December 2010, Sanchez assigned plaintiff to take the lead on planning a major pulmonary conference that was to take place in April 2011, taking over for Tumelty. Def. Ex. 10, [Dkt. 33-10]. Sanchez proposed this reassignment in an email dated December 20, 2010 at 2:00 p.m. Plaintiff sent an email the next day at 7:40 a.m. saying, "That is great; I love to do Pulmonary any time." Id. Plaintiff now claims that the point of this reassignment was to set her up to fail, in retaliation for her complaints about her discriminatory treatment. Pl. Facts, [Dkt. 39] at ¶ 28. As evidence for this, plaintiff says she protested about the amount of time she would have to do the program in a contemporaneous email to Sanchez, which is Plaintiff's Exhibit 1e2. That email purports to have been sent on December 20, 2010, at 2:17 p.m., and says, "In my 9 plus years in the department, I have never seen action like this; I feel this is happening to me

7

because I complained that I have been discriminated for the Chicago trip compensation." Pl. Ex. 1e2, [Dkt. 39-2] at 48. Defendant denies the authenticity of this email, claiming it could not be located on its servers and pointing to a number of discrepancies between this document and the other authentic emails in the record, including incomplete signature blocks for Ghebreab and Sanchez. Def. Rep., [Dkt. 40] at 12 n.4.

It is undisputed that plaintiff did assume control of the pulmonary event. On January 14, 2011, she submitted a draft of a program for the conference to the printer which incorrectly stated the first name of one of the conference presenters. Def. Ex. 12, [Dkt. 33-12]. Inova was charged $3,851.00 for the incorrect brochures, which had to be reprinted. Def. Ex. 13, [Dkt. 33-13]. Rather than accepting responsibility for the mistake, Ghebreab sent an email saying "the brochure was started when I got the program and unfortunately when I got it, it was late already . . . . I have been following directions and no one has said we need to change it." Def. Ex. 14, [Dkt. 33-14].

At around the same time, on January 17, 2011, plaintiff was presented with a written warning about her behavior in the workplace, citing "behavior disruptive of the workplace," "negative tone in e-mail to staff," "inappropriate monitoring of the actions of co-workers," "continuous use of idle threats creating an uncomfortable work environment," "threatening action without escalating concerns to manager/director," and "insubordinate behavior to manager." Def. Ex. 8, [Dkt. 33-8]. Once again, plaintiff refused to sign the document. Id.

On February 5, 2011, plaintiff attended a neurology conference with other CME Department members, at which defendant alleges that plaintiff was reading the newspaper during the setup period. Def. SUMF, [Dkt. 33] at ¶ 45. On February 7, Sanchez sent Ghebreab an email saying, "Even if registration has not opened, if we are on site and waiting for attendees,

8

reading the newspaper is not appropriate." Def. Ex. 15, [Dkt. 33-15] at 3. Ghebreab replied on February 8, saying:

> I just came to help and did not have any other intention so I just read the news paper about the supper ball just briefly before we started.
>
> . . .
>
> Unfortunately after ten years the CME Department became very hostile environment for me by complete accusations with falsified information and I was told by HR things are very sensitive with staff in the office because of me so I kept to my self and was trying to keep busy as the three of you were in the conference room talking.
> I am under a lot of stress and am very sick for the last 12 weeks, and am working with people who care about me how to deal with this because this is becoming very harmful environment for me.
>
> . . .
>
> I am also working on this complete accusation with inova officials before I move on with the solution out side inova. This would have been very simple to walk a way because of all these unfair treatments but I became disabled with ongoing treatment possible third surgery her serving Inova. Unfortuantely no one understands the pain, suffering an life change the injury made for me and my family, when I her random comments like (no slip and fall)[5] is very unkind. At this point I don't know what to tell you but I can tell you what is happening to me.
>
> . . .
>
> I came to work today and after receiving the e-mail below, which is part of the ongoing mistreatment, I started suffering, with migraine and tight chest I just put the problem at your hands to decide, at this point I see my self distracted/drained mentally and physically.

Id. at 1–2.

Sanchez forwarded Ghebreab's reply to Erario and Human Resources Officer Jackie Byrnum ("Byrnum"), saying that the situation had become "intolerable" and that the situation had "turned into a hostile and harassing environment" and she did "not see a way to resolve it." Id. The next day, Bagnoli resigned, citing "the hostile working environment and ongoing difficulty working with Eden Ghebreab." Def. Ex. 16, [Dkt. 33-16]. Erario wrote to Byrnum on February 10, asking to terminate Ghebreab in light of those concerns and her ongoing

---

[5] Plaintiff often uses parentheses in lieu of quotation marks.

9

performance issues. Id. The Director of Human Resources, Dianne Brundage ("Brundage") approved that request on the same day. Def. Ex. 17, [Dkt. 33-17].

On February 14, 2011, Inova terminated Ghebreab, issuing a summary report that cited four reasons for her termination: "Severe conduct issues that did not improve after the issuance of a Written Warning;" "Severe performance issues that did not improve after numerous counseling sessions;" missing financial reports; and sending confidential attendance records of co-workers from her work email account to her private email account. Def. Ex. 18, [Dkt. 33-18] at 1.

Ghebreab filed her charge of discrimination with the Fairfax County Human Rights Commission on April 25, 2011. Def. Ex. 19, [Dkt. 33-19]. The Equal Employment Opportunity Commission issued a right to sue letter on May 26, 2016. [Dkt. 4-1]. Plaintiff filed her original complaint in this Court on August 24, 2016. [Dkt. 1].

## II.  DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at

248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). Failure to do so "renders all other facts immaterial" and entitles the movant to judgment as a matter of law. Rhodes, 636 F.3d at 94. Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

## B. Discriminatory Compensation (Count 1)

A plaintiff in a Title VII action must file a timely charge of discrimination with the appropriate administrative agency before filing suit in federal court. "In a 'deferral' state, like Virginia, [a charge of discrimination] must be filed [with the appropriate agency] no later than 300 days 'after the alleged unlawful practice occurred ....' 29 U.S.C. § 626(d)(2)." Lewis v. Norfolk S. Corp., 271 F. Supp. 2d 807, 811 (E.D. Va. 2003). A plaintiff's failure to timely file a charge of discrimination deprives a federal court of subject-matter jurisdiction over the claim in question. Edwards v. Murphy-Brown, LLC, 760 F. Supp. 607, 618 (E.D. Va. 2011). Plaintiff argues that the time to file begins to run from the date on which she learned of the discriminatory nature of the treatment, rather than the act itself. The Fourth Circuit has flatly rejected such a rule, holding that the time starts "from the time the alleged unlawful practice occurred, not from the time that the employee discovered its discriminatory nature." Hamilton v. 1st Source Bank, 928 F.2d 86, 87–88 (4th Cir. 1990) (en banc) (emphasis in original) (internal citations and quotation marks omitted). Accordingly, the date of the act controls, not the date that plaintiff learned that she might have been the victim of race or nationality-based discrimination.

If not time-barred, to succeed on a claim of discrimination, a plaintiff must first demonstrate a prima facie case of discrimination, which requires establishing three elements: "(1) that [she was] employed by the defendant, (2) that [she] is a member of a protected class, and (3) that [she] was treated differently with respect to some condition of employment from others outside [her] class in a manner that creates an inference of discrimination." Saunders v. Stone, 758 F. Supp. 1143, 1146 (E.D. Va. 1991).

If a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. See

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Hux v. City of Newport News, 451 F.3d 311, 314–15 (4th Cir. 2006). Because this is only a burden of production, the reasons proffered need not ultimately persuade the court. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

To overcome a defendant's non-discriminatory reasons, the plaintiff must prove that those reasons were not the real basis for the adverse decision, but were in fact pretext for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). This third and final step "merges with the [plaintiff's] ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). If a plaintiff relies on stray comments to establish pretext, "minor incidents, even in the aggregate, do not merit relief." Mayo v. Smith, No. 1:15-cv-0029, 2016 WL 2894871, at *8 (E.D. Va. May 16, 2016).

This Court lacks subject-matter jurisdiction over plaintiff's claim for discriminatory treatment with respect to the Chicago comp time. Plaintiff alleges she was denied comp time some time in 2009, after attending the conference in August of that year, whereas her two white co-workers were granted comp time. That is the adverse employment action that is the basis of her discrimination count, not her termination. She did not file her charge with the EEOC until April 2011, well over a year after she was denied comp time. Accordingly, plaintiff did not timely exhaust this claim, which must be dismissed for lack of subject-matter jurisdiction.

Even if the Court were to consider the claim, it would fail on the merits. Assuming plaintiff has made out a prima facie case, defendant has advanced a non-discriminatory basis for the plaintiff not receiving comp time—namely, that Sanchez did not discuss the procedure for claiming comp time with plaintiff because she assumed that as a long-time member of the

13

department Ghebreab would know what the procedure for claiming comp time was.[6] Plaintiff has not produced any evidence to support her claim that this reason was a pretext for race or national origin discrimination, and the only evidence of any animus relating to plaintiff's race or national origin comes in the form of the unsigned, undated statement from Ghebreab that Sanchez made three comments about "Africa" or "Africans." Even if those statements could be authenticated such that they amounted to admissible evidence, three stray comments over a period of two years is insufficient as a matter of law to support an inference of racial animus, particularly when those statements have no connection to the incident that forms the basis of the discrimination claim. Accordingly, defendant is entitled to summary judgment on Count 1.

### C. Retaliatory Discharge (Count 2)

To succeed on a retaliation claim, a plaintiff must first make out a prima facie case by satisfying three elements: (1) she engaged in a protected activity known to the decisionmaker; (2) she suffered an adverse employment action; and (3) there is a causal relationship between the protected activity and the adverse employment action. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." Young v. HP Enterprise Servs., LLC, 2011 WL 3901881, at *5 (E.D. Va. Sept. 6, 2011) (internal citation and quotation marks omitted). Should a plaintiff make out a prima facie retaliation case, the McDonnell Douglas burden-shifting framework applies and shifts the focus to the employer's reason for taking the adverse employment action. Foster, 787 F.3d at 246. If the defendant produces evidence of a non-retaliatory reason for the adverse

---

[6] Although plaintiff claims that Sanchez affirmatively told her that she could not take comp time for the Chicago trip, rather than simply not discussing the issue with her, she has failed to cite evidence in the record to support that claim, as required by Fed. R. Civ. P. 56(c). Accordingly, that claim is not sufficient to defeat summary judgment.

14

employment action, the plaintiff must show that the asserted grounds for discharge were pretextual. Id. at 250.

Plaintiff has failed to support her allegation of protected activity with any evidence in this record. Although all of her written complaints speak in general terms of "discrimination" or "unfair treatment," they do not reference her race or national origin. Plaintiff's own account of her in-person meeting with Erario is the same. Although she claims that she mentioned that she was "different from" Tumelty and Bagnoli who are Caucasian, and that she "could not change" what was different about her, she never alleges that she mentioned her race or national origin during that conversation, and those comments are so vague that they would not lead a third party to conclude that Ghebreab was speaking about her race or national origin. In fact, if anything, the evidence in this record suggests that plaintiff was complaining about an injury she received on the job. Her last email to her supervisors before she was fired complains extensively that she was treated differently because of that injury. Accordingly, plaintiff has not satisfied the first element of a Title VII retaliation claim and defendant is entitled to summary judgment. In addition, she has failed to rebut the legitimate reasons cited as the basis for her termination.

III. CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 26th day of April, 2017.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge